# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHRISTEL ANDERSON HAYDEN,

       Plaintiff,

v.                                        No. CIV-15-0318 LAM

CAROLYN W. COLVIN, Acting Commissioner
of the Social Security Administration,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse and Remand for Rehearing, with Supporting Memorandum*** (*Doc. 20*), filed November 16, 2015 (hereinafter "motion"). On February 17, 2016, Defendant filed a response to Plaintiff's motion (*Doc. 24*), and, on March 1, 2016, Plaintiff filed a reply (*Doc. 26*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to the undersigned United States Magistrate Judge to conduct all proceedings and enter a final judgment in this case. *See* [*Docs.* 4 and 7]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 15*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **DENIED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **AFFIRMED**.

# I.   Procedural History

On, September 30, 2010, Plaintiff protectively filed an application for Disability Insurance Benefits (hereinafter "DIB"), alleging that she became disabled on May 31, 2010.   [*Doc. 15-14* at 14].   Plaintiff claimed to be disabled due to "systemic sclerosis,[1] cirrhosis,[2] gastroparesis,[3] and [attention deficit hyperactivity disorder]" (hereinafter "ADHD").   *Id.* at 18.   Plaintiff's application was denied at the initial level on May 13, 2011 (*Doc. 15-10* at 10-13), and at the reconsideration level on November 4, 2011.   [*Doc. 15-9* at 3].   Pursuant to Plaintiff's request (*Doc. 15-10* at 19-20), Administrative Law Judge Myriam C. Fernandez Rice (hereinafter "ALJ") conducted a hearing on May 23, 2013.   [*Doc. 15-8* at 2-27].   At the hearing, Plaintiff was present, represented by non-attorney Micki Kindley, and testified.   *Id.* at 4-18, 20-21.   Plaintiff's husband, Brent Howard, also testified (*id.* at 24-26), as did Vocational Expert (hereinafter "VE") Karen N. Provine (*id.* at 19-24).

On August 23, 2013, the ALJ issued her decision, finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled through the date of the decision.   [*Doc. 15-7* at 32].   Plaintiff requested that the Appeals Council review the ALJ's decision.   [*Doc. 15-7*

---

[1] "Scleroderma," also known as systemic sclerosis, is defined as "[t]hickening and induration of the skin caused by new collagen formation, with atrophy of pilosebaceous follicles."   Stedman's Medical Dictionary (27th ed., Lippincott Williams & Wilkins 2000) at 1604.

[2] "Cirrhosis" is defined as "[e]ndstage liver disease characterized by diffuse damage to hepatic parenchymal cells, with nodular regeneration, fibrosis, and disturbance of normal architecture."   *Id.* at 355.

[3] "Gastroparesis" is defined as "[w]eakness of gastric peristalisis, which results in delayed emptying of the bowels."   *Id.* at 733.

at 26-27].   On February 20, 2015, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision."   [*Doc. 15-3* at 9-12].   This decision was the final decision of the Commissioner.   On April 20, 2015, Plaintiff filed her complaint in this case.[4]   [*Doc. 1*].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*,   522 F.3d 1093, 1096   (10th Cir. 2008)   (citing   *Hamilton v. Sec'y of Health & Human Servs.*,   961 F.2d 1495, 1497–98   (10th Cir. 1992)).   If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief.   *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).   Courts should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.   *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d

_____

[4]  Plaintiff indicated in her brief that she has a new, pending DIB application, filed on May 20, 2015 but with a claim date of October 1, 2013, based on the Appeals Council's authorization.   [*Doc. 20* at 2 n.1].   See also [*Doc. 15-3* at 10].

at 760 (citation and quotation marks omitted).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted).  While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## III. Applicable Law and Sequential Evaluation Process

For purposes of DIB, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 405.1505(a).  In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either

(3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

## IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff is married and the mother four minor children, and has a long history of chronic pain.   She was 36 years old on May 31, 2010, the onset of disability date, which is considered a "younger person."[5]   [*Doc. 15-12* at 12].   Plaintiff graduated from high school and completed one year of college.   [*Doc. 15-14* at 19].   She also received training in the area of "web programing" in 2003.   *Id*.   Prior to her alleged disability, Plaintiff had worked as a graphic designer, a clerk and assistant manager in retail, and an office clerk, among other things.   *Id*. at 2 and 19.

Plaintiff's medical records include:   Emergency Room treatment records for the period from May 2009 through November 2010 from Lovelace Medical Center (*Doc. 15-18* at 2 through *Doc. 15-20* at 16; *Doc. 15-22* at 25-33; *Doc. 15-23* at 2-9); consultation records dated January 13, 2011 and March 24, 2011 from Cheranne McCracken, Pharm.D. (*Doc. 15-22* at 12-14; *Doc. 15-25* at 2-4); consultation records dated December 3, 2010 from Manuel A. Gurule, M.D. (*Doc. 15-22*

---

[5]   *See* 20 C.F.R. § 404.1563(c) (defining a "younger person" as "under age 50").

at 15-17); treatment records for the period August 2012 through May 2013 from Gregg A. Valenzuela, M.D. (*Doc. 15-36* at 2 through *Doc. 15-37* at 11); treatment records, for the period October 2012 through March 2013 from M. Anas Tarakji, M.D. (*Doc. 15-29* at 5-8, 25-27); treatment records dated December 12, 2012 from Baljinder Sandhu, M.D. (*Id.* at 9-17); treatment records dated July 6, 2012 from Natalia R. Chavez Chiang, MD. (*Doc. 15-32* at 22 through *Doc. 15-33* at 5); consultation records dated December 10, 2008 and March 3, 2011 from Vijayalakshmi Kumar, M.D. (*Doc. 15-24* at 13-15, 24-26); treatment records for the period February 2010 through June 2012 from Lance R. Gibson, M.D. (*Doc. 15-21* at 5-11, *Doc. 15-25* at 44-51, *Doc. 15-26* at 34-57, *Doc. 15-30* at 18-38); physical therapy records for the period from September 2012 through December 2012 from Kaseman Presbyterian Hospital Therapy (*Doc. 15-28* at 5-43); disability determination examination by Melanie M. Falgout, M.D, dated April 30, 2011 (*Doc. 15-25* at 53-57); and physical RFC from Lawrence Kuo, M.D. (*Doc. 15-26* at 2-10).   Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process the ALJ found that Plaintiff "has not engaged in substantial gainful activity" since her alleged disability onset date of May 31, 2010. [*Doc. 15-7* at 34].   At step two, the ALJ found that Plaintiff has the following severe medically determinable impairments:   obesity, fibromyalgia,[6] sleep apnea,[7] headaches, and polycythemia.[8]

---

[6] "Fibromyalgia" is defined as ""[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause."   Diagnostic criteria include "pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites."   Stedman's at 671.

*Id.*   The ALJ also found that Plaintiff's "medically determinable impairments of depression and [ADHD] do not cause more than minimal limitation in [Plaintiff]'s ability to perform basic mental work activities and are therefore non[-]severe."   *Id.* at 35.   Next, the ALJ found that Plaintiff had not established that either multiple sclerosis[9] or chronic fatigue syndrome (hereinafter "CFS")[10] was a "medically determinable impairment."   *Id.* at 36.   Finally, the ALJ found that Plaintiff's "obesity does not indicate any limits when standing alone.   However, when taken in combination with the other impairments, it counsels in favor of the postural and exertional limits indicated herein."   *Id.*   At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. Part 404, Subpt. P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).   *Id.*   In so finding, the ALJ considered "Listings under Sections 1.00 (musculoskeletal), 3.00 (respiratory), 4.00 (cardiovascular), 5.00 (digestive), and 12.00 (mental)."

---

[7] "Sleep apnea" is defined as "a disorder . . . characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues."   It results in "hypoxemia and chronic lethargy."   *Id.* at 111.

[8] Polycythemia is defined as "[a]n increase above the normal in the number of red cells in the blood."   *Id.* at 1420.

[9] At the ALJ hearing, Plaintiff and her representative both denied that Plaintiff suffered from multiple sclerosis, and indicated that someone else's medical record to that effect had been inadvertently included with Plaintiff's.   [*Doc. 15-8* at 6-7].

[10] Chronic fatigue syndrome "is a systemic disorder consisting of a complex of symptoms that may vary in frequency, duration, and severity."   Soc. Sec. Rep. 14-1p, 2014 WL 1371245, *2 (April 3, 2014).   It "causes prolonged fatigue lasting 6 months or more," and "a physician should make a diagnosis of CFS only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded."   *Id.* (internal quotation marks and citation omitted).

Before step four, the ALJ determined that Plaintiff had the RFC "to perform light work as defined in 20 C.F.R. 404.1567(b); however, [Plaintiff] can never climb ladders and can crouch no more than occasionally.  She must avoid even moderate exposure to moving machinery or unprotected heights."  *Id*. at 37.   In support of her RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause at least some of the alleged symptoms and conclude[d] that [Plaintiff] would have difficulty lifting more than ten pounds frequently or twenty pounds occasionally."  *Id*. at 41.   The ALJ also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible since they are generally inconsistent with the minimal clinical findings contained in the record as well as assessments indicating full strength in bilateral upper and lower extremities and no evidence of decreased grip strength."  *Id*.

At step four, the ALJ found that, given Plaintiff's RFC, she "is capable of performing [her] past relevant work as a graphics designer, sales clerk, telephone answering service operator, and general clerk."  *Doc. 15-7* at 42.   The VE testified that graphics design (DOT 141.061-018)[11] is considered sedentary, skilled work.  [*Doc. 15-8* at 21].   Sales clerk (DOT 290.477-014) and general clerk (DOT 209.562-010) positions are both considered light, semi-skilled work, and telephone answering service operator (DOT 235.662-026) is a sedentary, semi-skilled position. *Id*.  Based on this, the ALJ concluded that Plaintiff was not disabled within the meaning of the

---

[11] "DOT" stands for Dictionary of Occupational Titles.

Social Security Act from May 31, 2010 to the date of the decision.   *Id.*   Therefore, the ALJ did not proceed to the fifth step of the SEP.[12]

# V.   Analysis

Plaintiff makes the following arguments in her motion to reverse or remand: (1) the ALJ erred at step two by failing to find CFS to be a severe impairment (*Doc. 20* at 11-14); and (2) the ALJ failed to address the effects of CFS, fibromyalgia, and obesity in her RFC narrative (*id.* at 14-22).   In response, Defendant contends that the ALJ's decision is supported by substantial evidence, since a reasonable person could agree that CFS had not been shown to be a medically determinable impairment (*Doc. 24* at 4-6), and that Plaintiff remained capable of light work despite her impairments (*id.* at 6-9).   In Plaintiff's reply, she asserts that Defendant failed to establish that the ALJ complied with the appropriate regulations and rulings.   [*Doc. 25*].

## A.   The ALJ's Consideration of CFS

As already noted, Plaintiff has the burden at steps one through four of the SEP, and must show that she has a severe medically determinable impairment, or combination of impairments, and that either that impairment meets or equals a listed, presumptively disabling, impairment or the claimant is unable to perform his or her past relevant work.   Here, the ALJ found that Plaintiff suffered from five severe impairments:   obesity, fibromyalgia, sleep apnea, headaches, and polycythemia.   [*Doc. 15-7* at 34].   With respect to Plaintiff's claimed impairment of CFS, the

---

[12] If a claimant is found able to perform past relevant work at step four, she is considered not disabled and there is no need for the ALJ to consider whether she can make an adjustment to other work at step five. 20 C.F.R. § 404.1520(a)(4)(iv).

ALJ found that "the record does not support a finding that the claimant has such a diagnosis with [the required] symptoms."   *Id*. at 36.   Thus, the ALJ did not consider CFS to be a "medically determinable impairment" that must be considered in an RFC determination. 20 C.F.R. § 404.1529(b) ("symptoms, such as pain [or] fatigue, . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present").

   Plaintiff contends that there is more than adequate evidence of CFS in her medical records, citing the diagnostic criteria set forth in Soc. Sec. Rep. 99-2p.[13]   [*Doc. 20* at 12-13].   Plaintiff points out that, at various times, she has claimed to have symptoms of short-term memory or concentration deficits; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern or severity; unrefreshing sleep; and postexertional malaise lasting more than 24 hours.[14]   *Id*.   The Court assumes, for the purposes of reviewing the ALJ's decision, that Plaintiff

---

[13] The Court notes that both the ALJ and Plaintiff discussed Plaintiff's claimed CFS impairment under the guidelines set forth in Soc. Sec. Rep. 99-2p, 1999 WL 271569 (April 30, 1999).   However, SSR 99-2p was specifically rescinded and replaced by SSR 14-1p, 2014 WL 1371245 at *1 (April 3, 2014).   Neither decision clearly supports Plaintiff's claim, however.

[14] These are the symptoms set forth in Soc. Sec. Rep. 99-2p.   Currently, however, the Administration relies more heavily on the definition of CFS adopted by the Center for Disease Control (hereinafter "CDC").   Soc. Sec. Rep. 14-1p at *2-3.   "Under the CDC case definition, the hallmark of CFS is the presence of clinically evaluated, persistent or relapsing chronic fatigue that:   1. Is of new or definite onset (that is, has not been lifelong); 2. Cannot be explained by another physical or mental disorder; 3. Is not the result of ongoing exertion; 4. Is not substantially alleviated by rest; and 5. Results in substantial reduction in previous levels of occupational, educational, social, or personal activities."   *Id*. at *3.   In addition, at least four or more of the following concurrent, specific symptoms must persist or recur during 6 or more consecutive months and not pre-date the fatigue: postexertional malaise lasting more than 24 hours; self-reported impairment of short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities; sore throat; tender cervical or axillary lymph nodes; muscle pain; multi-joint pain without joint swelling or redness; headaches of

has exhibited a sufficient number of CFS symptoms to satisfy the applicable standard.   However, that does not mean that she has established that she has a medically determinable CFS impairment. There are a number of problems with Plaintiff's assertion that she does.   First, no medically acceptable source has ever been willing to diagnose Plaintiff with CFS, although they have considered it to be a possibility.   Second, virtually all of Plaintiff's symptoms are self-reported rather than documented by medical tests or exams.   There is, in fact, very little medical evidence that substantiates her numerous claims.   Third, virtually all of Plaintiff's symptoms can be explained by other illnesses or conditions, including fibromyalgia, which the ALJ found was a medically determinable impairment from which Plaintiff suffers.   Finally, the existence of a medically determinable impairment is a factual issue on which Plaintiff bears the burden of proof and on which this Court has limited review authority.   *See, e.g.*, *Lax*, 489 F.3d at 1084 (reviewing court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice") (citing *Zoltanski*., 372 F.3d at  1200) (internal punctuation omitted).

One requirement of a CFS diagnosis is exclusion of all other possible causes of a patient's symptoms.   *See* Soc. Sec. Rep. 14-1p at *3 (CDC definition requires, among other elements, that the chronic fatigue "[c]annot be explained by another physical or mental disorder").   In Plaintiff's case, numerous doctors have considered CFS as a possible diagnosis, including Drs. Gibson, Kumar, Chiang, and Tarakji, but none of them ever actually confirmed that Plaintiff has CFS.

---

a new type, pattern, or severity; and waking unrefreshed.  *Id*.  While these requirements are similar, they are not identical.

Indeed, it would be impossible to do so since at least two physicians, Drs. Kumar and Chiang, have specifically diagnosed Plaintiff's symptoms as fibromyalgia.  In fact, when considering Plaintiff's symptoms, the "consensus," to the extent there is one, appears to be that they are caused by fibromyalgia, rather than CFS.  Although Plaintiff made it clear to Dr. Kumar and to Dr. Chiang that she did not agree with the diagnosis of fibromyalgia (*Doc. 15-24* at 25; *Doc. 15-32* at 28),[15] she did not offer either a medical opinion or medical evidence that conflicts with their and the ALJ's finding of fibromyalgia, rather than CFS, to be her severe impairment.

Plaintiff simply failed to provide appropriate evidence to support her claim that she has a medically determinable impairment of CFS:

> A person can establish that he or she has a[ medically determinable impairment] of CFS by providing appropriate evidence from an acceptable medical source.  A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence.  We cannot rely upon the physician's diagnosis alone.  The evidence must document that the physician reviewed the person's medical history and conducted a physical exam.

Soc. Sec. Rep. 14-1p at *4.  None of the many acceptable medical sources that treated or examined Plaintiff provided either a diagnosis or an opinion regarding Plaintiff's condition.[16]

---

[15] However, Plaintiff was advocating for a diagnosis of scleroderma, rather than CFS.

[16] Plaintiff states that Dr. Gibson "assessed" her with CFS in 2011.  [*Doc. 20* at 4-5].  However, the claimed assessment appears to be more in the nature of a working theory for insurance purposes than a true diagnosis. *See, e.g.,* [*Doc. 15-25* at 734, 737] (noting after CFS listing that a rheumatology second opinion was pending).  Two other facts weigh heavily against considering Dr. Gibson's records to constitute a formal diagnosis of CFS.  First, Dr. Gibson routinely and repeatedly referred Plaintiff to medical specialists in order to obtain a cause for Plaintiff's complaints.  Second, he did not provide an opinion to that effect, or any opinion at all, in Plaintiff's protracted disability proceedings.  In addition, the ALJ did, in fact, consider Dr. Gibson's notes and records regarding Plaintiff's symptoms and complaints, along with those of all of her other doctors, in making her findings of Plaintiff's severe impairments.

Under these circumstances, this Court cannot conclude that the ALJ's determination that Plaintiff does not have a medically determinable impairment of CFS is without substantial evidentiary support.   Therefore, this Court concludes that the ALJ's decision to that effect was appropriate, and Plaintiff is not entitled to relief on the basis that the ALJ determined that CFS was not a severe medically determinable impairment from which Plaintiff suffers.   Moreover, as will be discussed hereinafter, even if the ALJ had erred in making this finding, that error would be harmless due to her additional finding that Plaintiff does have a severe impairment of fibromyalgia.

## B.   The ALJ's RFC Determination

The ALJ must base her RFC assessment on all of the relevant evidence in the record, such as medical history, laboratory findings, effects of treatment and symptoms, including pain, reports of daily activities, lay evidence, recorded observations, medical source statements, evidence from attempts to work, need for a structured living environment, and work evaluations, if any. Soc. Sec. Rep. 96-8p at *5.   "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.,* laboratory findings) and nonmedical evidence (*e.g.,* daily activities, observations)."   *Id*. at *7.   The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and the RFC assessment must always consider and address medical source opinions.   *Id*.   Because the ALJ must consider the whole record, she is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to [her] position while ignoring other evidence."   *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (citation and internal quotation marks omitted).   When there are multiple

opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions.   *Hamlin*, 365 F.3d at 1215 (citation omitted).

Because the Court has already concluded that the ALJ's exclusion of CFS from Plaintiff's impairments was not error, it would not be appropriate to consider CFS symptoms in connection with Plaintiff's RFC assessment.   Nonetheless, the symptoms of CFS and fibromyalgia often overlap:

> Individuals with fibromyalgia (FM) and/or chronic fatigue syndrome (CFS) report arthralgias [joint pains] and myalgias [muscle pains].   However, only persons with FM alone exhibit abnormal pain responses to mild levels of stimulation, or allodynia.[17]

Bradley, L.A., McKendree-Smith, N.L., Alarcon, G.S., "Pain complaints in patients with fibromyalgia versus chronic fatigue syndrome," http://www.ncbi.nlm.nih.gov/pubmed/10998728 (site last visited May 12, 2016).

> Most experts agree that the symptoms of CFS and FM are so close that they are - for all intents - the same disorder.
> \*       \*       \*

_____

[17] Dr. Chiang specifically found that Plaintiff had 18/18 tender points and allodynia on exam (*Doc. 15-32* at 29).   Under this definition, allodynia (or abnormal pain responses) rules out CFS.   The Social Security Ruling on which Plaintiff relies, Soc. Sec. Rep. 99-2p relied on a minimum number of "tender points" as indicative of CFS.   *Id.* at \*3.   The more recent, superseding, decision, Soc. Sec. Rep. 14-1p, relies heavily on the CDC definition of CFS, which does not include tender points (*see id.* at \*3).   SSR 14-1p does, however, list tender points among the several symptoms that may "help establish the existence of an MDI of CFS," while also noting that "[t]here is considerable overlap of symptoms between CFS and FM [fibromyalgia], but people with CFS who also have tender points have an MDI.   People with impairments that fulfill the American College of Rheumatology criteria for FM (which includes a minimum number of tender points) may also fulfill the criteria for CFS.   *See* SSR 12-2p.   However, we may still find that a person with CFS has an MDI if he or she does not have the specified number of tender points to establish FM."   *Id.* at \*4 n.21.   Thus, the CFS ruling (SSR 14-1p) itself refers to another agency ruling regarding fibromyalgia (Soc. Sec. Rep. 12-2p (July 25, 2012) (making a finding of at least 11 out of 18 tender points one of 3 criteria for fibromyalgia)).

> The symptoms are similar for both syndromes, including debilitating fatigue, post-exertional malaise, feverishness, sore throat, headache, joint aches, a feeling of generalized weakness, subjective swelling, non-radicular paresthesias (numbness or tingling that does not follow typical nerve patterns), memory loss, forgetfulness, confusion, irritability, and depressed mood.

Lapp, W., M.D., "CFS versus FM: Twins, Cousins, or Just Acquaintances?" http://www.cfidsself help.org/library/cfs-versus-fm-twins-cousins-or-just-acquaintances (site last visited May 12, 2016). Thus, in considering the symptoms of fibromyalgia, the ALJ could, and apparently did, consider virtually all of Plaintiff's claimed symptoms in connection with her determination of Plaintiff's RFC.

Plaintiff contends that the ALJ "profoundly misunderstood" the diagnoses of CFS and fibromyalgia. [*Doc. 20* at 14]. To the contrary, the ALJ paid close attention to the signs and symptoms of those syndromes – enough so that she was able to make a reasonable determination from the medical evidence that Plaintiff suffers a medically determinable impairment of one, but not the other. Given the similarity of the two syndromes, it is disingenuous to argue that the failure to conclude that CFS was a medically determinable impairment was harmful error. The ALJ did not dismiss any of Plaintiff's symptoms based on that determination, nor did she rule that Plaintiff had failed to establish both syndromes as medically determinable impairments. Instead, she considered years of medical records and clinical findings, along with the only medical opinions that were available to her – those of the DDS consulting doctors – and identified the syndrome that most closely matched Plaintiff's complaints, her physician's findings, and the only clear "diagnoses" in her records, and determined that impairment to be severe. The ALJ then found that Plaintiff's severe impairments "could reasonably be expected to cause at least some of the alleged symptoms," (*Doc. 15-7* at 41) and proceeded to determine the severity of those

symptoms.   An ALJ's consideration of severity of symptoms is based on both the medical evidence and the claimant's subjective complaints.   To the extent that a claimant's complaints are discounted based on the ALJ's assessment of the claimant's credibility, that assessment is "peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence."   *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). However, "credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."   *Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988); internal quotation marks omitted).   Here, unlike in *Kepler*, the ALJ recited specific evidence she had relied on in determining that Plaintiff's claims regarding the severity of her symptoms were not credible.   *See* [*Doc. 15-7* at 39-42].   *See also, Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) ("*Kepler* does not require a formalistic factor-by-factor recitation of the evidence.   So long as the ALJ sets forth the specific evidence [s]he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied").

The ALJ noted that Plaintiff testified that she no longer drove due to memory problems, difficulty maintaining the speed limit, and hand cramping (*Doc. 15-7* at 38), that she is unable to perform any housework because of her inability to stand, stoop, or bend due to pain (*id.*), has difficulty lifting even one gallon of milk (*id.*), uses a cane whenever she leaves her house (*id.* at 38-39), can sit for no more than thirty minutes at a time because she must shift constantly due to hip and lower back pain (*id.* at 39), cannot stand for more than ten minutes (*id.*), and is constantly fatigued (*id.*).   Although Plaintiff's medical records contain many such complaints by her, they contain correspondingly few findings of actual physical limitations.

The ALJ recognized that Plaintiff suffers from chronic pain, but discounted the severity of that pain based on the medical records and opinions that were available, finding that Plaintiff's descriptions of her symptoms were "generally inconsistent with the minimal clinical findings contained in the record as well as assessments indicating full strength in bilateral upper and lower extremities and no evidence of decreased grip strength."   [*Doc. 15-7* at 41].   This finding is supported by substantial evidence.   There are, in fact, many medical records that suggest that Plaintiff's symptoms may be less disabling than she claims.   For example, in November 2010, Plaintiff was described as "reasonably active" in an ER visit in which her "chief complaint" was pain in her left calf.   [*Doc. 15-20* at 12-13].   In January 2011, Dr. McCracken noted that Plaintiff had "no apparent discomfort while sitting," but walks without bending her left knee.   [*Doc. 15-22* at 14].   In March 2011, Dr. Kumar, a rheumatologist, described Plaintiff as "not in any acute physical or respiratory distress," and as having normal range of motion (hereinafter "ROM") in her shoulders, elbows, wrists, hips, knees, and ankles.   [*Doc. 15-24* at 25].   Dr. Kumar also noted that Plaintiff's cervical spine ROM was normal in all directions and, although she had multiple tender points, her straight leg raise test was normal.   *Id.*   In April 2011, Plaintiff reported to Dr. Falgout, the examining consultant from the DDS, that she could tolerate standing for only 10-15 minutes, walking for 2 minutes, sitting for 15-20 minutes, and could lift only 5 pounds (*Doc. 15-25* at 54), yet Dr. Falgout noted that Plaintiff was "able to ambulate without difficulty, able to get on and off the exam table without problems, up and out of a chair" (*id*. at 55). Plaintiff's gait was normal without an assistive device, her grip strength was 5 of 5 in both hands, motor strength was also 5 of 5 in both upper and lower extremities, and she had normal ROM in her elbow, forearm, wrist, cervical spine, lumbar spine, hip, knee, and ankle, had a negative

straight leg raise, and "was able to lay straight back on the table." *Id*. at 56. However, Plaintiff had a slight decrease in internal shoulder rotation bilaterally, could not walk on her heels or on her toes, "was minimally able to squat," and had decreased sensation in her palms. *Id*.

In September 2011, Plaintiff's primary care physician, Dr. Gibson, noted during a routine visit that Plaintiff was "negative for fatigue." [*Doc. 15-26* at 53]. In July 2012, at a rheumatology consultation, Dr. Chiang noted that Plaintiff was in no acute distress, had no joint tenderness, "[s]trength 5/5 distal/proximally," and a steady gait. [*Doc. 15-32* at 29]. Dr. Chiang also noted that Plaintiff had 18/18 tender points and allodynia. *Id*. In August 2012, Plaintiff was observed to have normal ROM on musculoskeletal exam by Jerry Bridges, N.P., but lumbar back tenderness, which was worse on flexion than extension. [*Doc. 15-38* at 11]. Also in August 2012, Plaintiff was observed by Dr. Valenzuela, M.D. to be "in no acute distress." [*Doc. 15-37* at 9]. Dr. Valenzuela observed, in September 2012, that musculoskeletal examination of Plaintiff indicated no tenderness. [*Doc. 15-36* at 5]. In October 2012, Plaintiff had normal ROM on musculoskeletal exam, though her lumbar back did exhibit tenderness. [*Doc. 15-39* at 9]. Also in October 2012, Dr. Tarakji, who was consulting with respect to Plaintiff's polycythemia, found that Plaintiff had no bone or joint pain on musculoskeletal examination, and described her polycythemia as "very mild." [*Doc. 15-29* at 26-27]. At a neurology clinic visit in December 2012, Plaintiff was described by Dr. Sandhu as "comfortable," and her prior nerve conduction study and MRI test were both deemed "unremarkable." *Id*. at 11. It was noted that there was no further work-up needed from a neurological standpoint, and that the "plan" was to give Plaintiff "reassurance" and for her to follow up with her primary care physician. *Id*. Also in December 2012, Dr. Valenzuela again noted that Plaintiff had no tenderness on musculoskeletal exam.

[*Doc. 15-36* at 11].   Although Plaintiff was "positive" for fatigue, all aspects of her physical exam were normal, though Dr. Valenzuela noted that she was "very obese, walks with cane."   *Id*.   In February 2013, Nurse Practitioner Bridges noted that Plaintiff had "mild tenderness over facets and multi-site pain," but normal ROM.   [*Doc. 15-40* at 7].   In March 2013, Dr. Tarakji once again noted that Plaintiff had no bone or joint pain, and was ambulating normally.   [*Doc. 15-29* at 5-6].   In May 2013, Dr. Valenzuela again noted that Plaintiff had no tenderness on musculoskeletal exam, and all other physical exam categories were also normal.   [*Doc. 15-37* at 6-7].   Finally, in October 2013, Plaintiff was again found by Nurse Practitioner Bridges to have normal ROM, despite lumbar back tenderness.   [*Doc. 15-41* at 9-10].

Other records also appear to indicate that Plaintiff's reporting of the severity of her symptoms does not always correlate with her physical examinations, and also that Plaintiff's own view of her diagnosis persists despite the disagreement of her doctors.   In a nineteen-month period from May 2009 (one year prior to her alleged onset date) to November 2010 (six months after onset), Plaintiff was seen in the emergency room (hereinafter "ER") seven times.   In May 2009, Plaintiff complained of upper body and chest pain, which was attributed to fibromyalgia and she was given a fibromyalgia information sheet.   [*Doc. 15-18* at 13-22].   In July 2009, Plaintiff complained of pain and swelling in her left calf.   *Id*. at 28.   She was given an ultrasound

examination based on her reported history of deep vein thrombosis (hereinafter "DVT"),[18] which was negative for DVT but did indicate the presence of some varicose veins.[19]   *Id*. at 30.   On December 14, 2009, Plaintiff reported abdominal pain, her abdomen was x-rayed, and she was diagnosed with constipation.   [*Doc. 15-19* at 9-22].   Plaintiff returned to the ER on December 30, 2009 complaining of right upper quadrant abdominal pain, at which time a gall bladder emptying study ordered by her primary care physician after her previous ER visit was performed.   *Id*. at 25-30.   Plaintiff's nuclear medicine hepatobiliary scan[20] was determined to be "unremarkable."   *Id*. at 29.   In May 2010, Plaintiff arrived at the ER complaining that she had been sitting at her desk when she became dizzy, nauseated, and vomited.   *Id*. at 36.   She had short term memory loss regarding the event.   *Id*.   A CT scan of Plaintiff's head and brain was performed, which showed "no acute intra cranial process."   *Id*. at 44.   Afterwards, Plaintiff wore a Holter monitor[21] to check for heart irregularities, which was also normal.   [*Doc. 15-22* at 26].

---

[18] DVT occurs when a blood clot forms in one or more deep veins in the body, usually the legs.  http://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/basics/definition/con-20031922 (site last visited May 2, 2016).

[19] Varicose veins are gnarled, enlarged veins, most commonly in the legs and feet.   They may cause aching pain and discomfort.  http://www.mayoclinic.org/diseases-conditions/varicose-veins/home/ovc-20178078 (site last visited May 2, 2016).

[20] A hepatobiliary scan is an imaging procedure used to diagnose problems of the liver, gallbladder and bile ducts.  http://www.mayoclinic.org/tests-procedures/hida-scan/home/ovc-20200578   (site last visited May 2, 2016).

[21] A Holter monitor uses electrodes and a recording device to track heart rhythm over a period of one to two days for the purpose of detecting irregular heartbeats.  http://www.mayoclinic.org/tests-procedures/holter-monitor/basics/definition/prc-20015037 (site last visited May 2, 2016).

In October 2010, Plaintiff came to the ER complaining of headache, consisting of migraine, nausea, vomiting, and visual field defect.   [*Doc. 15-19* at 46-47].   Plaintiff was given fluids, and her headache fully resolved.   [*Doc. 15-20* at 3-4].   Finally, in November 2010, Plaintiff returned to the ER complaining of leg pain of unknown origin.   [*Doc. 15-20* at 7].   Based on her claimed history of DVT, the doctors intended to perform an ultrasound to determine whether that was the cause of Plaintiff's pain.   *Id*. at 7-10.   However, Plaintiff refused the procedure and left the ER "against medical advice," claiming that the doctor did not know how to treat her condition.[22]   *Id*. at 13.

> In March 2011, Dr. Kumar noted that:
>
> P[laintiff] "was somewhat unhappy and frustrated regarding her clinical presentation and the options available in managing myofascial[23] pain.   She believes strongly that she has something else more and not just fibromyalgia/myofascial pain syndrome.   Unfortunately, there is not much else I can offer.   She believes that my notes and my diagnosis is unfairly influencing other doctor's opinions.   She believes that her primary care provider thinks that she has scleroderma.

*Doc. 15-24* at 26.   According to Dr. Kumar's report, Plaintiff's primary care physician had requested a consultation to "[r]ule out scleroderma," but Plaintiff reported to him that her doctor had diagnosed scleroderma and that she had seen his partner for a second opinion consultation

---

[22] This is not the only time that Plaintiff did not follow her doctors' orders.   In April 2011, she was deemed "non-compliant" with use of her CPAP device, which is used to minimize episodes of sleep apnea (*Doc. 15-26* at 20), and in December 2012, she was again deemed "noncompliant" by her physical therapist, after having shown up only for the initial evaluation but not for any therapy sessions (*Doc. 15-27* at 5).

[23] "Myofascial" refers to "the fascia surrounding and separating muscle tissue."   Stedman's at 1173.

"who also agrees with this diagnosis."   *Id*. at 24.   Dr. Kumar, however, found "no evidence of scleroderma" on examination.   *Id*. at 26.   The following month, Plaintiff reported to Dr. Falgout that she had systemic sclerosis that had not been officially diagnosed yet.   [*Doc. 15-25* at 53].   In July 2012, Plaintiff was seen by Dr. Chiang with "a chief complaint of Scleroderma." [*Doc. 15-32* at 28].   Plaintiff brought four pages of hand-written physical complaints with her to the consultation.   *Id*.   Dr. Chiang noted that Plaintiff had been given "an extensive rheumatologic work-up; which showed negative serologies [24] with no systemic inflammation; confirming diagnosis of fibromyalgia associated with sleep apnea."   *Id*.   In September 2012, Plaintiff reported in a physical therapy evaluation that she was in Stage I renal failure, and was working with oncology and kidney doctors (*Doc. 15-28* at 40), yet there is no evidence of such a diagnosis in her records.   Later, Plaintiff reported to Nurse Practitioner Bridges that she had not gone to her physical therapy appointments because of a recent MRSA[25] infection.   [*Doc. 15-39* at 9].   There is likewise no record of a MRSA infection in Plaintiff's records.   In addition, in January 2011, Plaintiff denied any history of drug problems to Dr. McCracken during an evaluation of her medications, but Dr. McCracken noted that a "previous clinic note documents history [of] crystal

---

[24] "Serologies" are blood serum tests "to detect the presence of antibodies against a specific antigen." http://www.merriam-webster.com/medical/serology (site last visited May 9, 2016).

[25] MRSA stands for "Methicillin-resistant *Staphylococcus aureus*" which is an antibiotic-resistant bacteria that is most commonly found in skin infections, and that can lead to life-threatening bloodstream infections. http://www.cdc.gov/mrsa/ (site last visited May 9, 2016).

meth [-] clean since 1998."[26]   [*Doc. 15-22* at 13].   In late 2013, Plaintiff was diagnosed by Nurse

Practitioner Bridges with "opioid dependence, continuous."   [*Doc. 15-41* at 9].

Plaintiff obviously suffers from some diffuse pain, which her doctors have taken seriously

and have made every effort to reduce.   The ALJ considered the medical evidence of pain and

fatigue symptoms to establish a severe impairment of fibromyalgia.   The ALJ also found that the

medical evidence established that Plaintiff has medically determinable severe impairments of

obesity, sleep apnea, headaches, and polycythemia, and non-severe impairments of depression and

ADHD.   All of these impairments were considered by the ALJ in determining Plaintiff's RFC.[27]

However, in her remand motion, Plaintiff contends that the ALJ did not properly consider the

effects of CFS, fibromyalgia, and obesity in Plaintiff's RFC.   [*Doc. 20* at 14-22].   Since the

Court has already determined that the ALJ did not err in her finding that CFS is not a medically

determinable impairment that Plaintiff suffers from, it cannot have been error to disregard CFS in

determining Plaintiff's RFC.

Significantly, although Plaintiff contends that the ALJ did not properly consider the effects

of fibromyalgia and obesity, she did not provide even one Physical RFC from any of her many

treating physicians.   This failure left the ALJ with no opinions upon which to rely except those of

---

[26] There is also the following note in Plaintiff's May 2013 gastrointestinal consultation history:   "Comment: quit 11-3-1988n [sic] crystal meth."   [*Doc. 15-37* at 5].

[27] 20 C.F.R. § 404.1523 requires, in cases of multiple impairments, that the ALJ "consider the combined effect of all of [the] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity," and that "the combined impact of the impairments will be considered throughout the disability determination process."

Dr. Falgout, an examining consultant (*Doc. 15-25* at 53-57), and non-examining consultants

Lawrence Kuo, M.D. (*Doc. 15-26* at 2-10) and Allen Gelinas, M.D. (*Doc. 15-9* at 3-15)

Although such opinions are typically considered to fall in the middle and bottom of the weighting

scale for medical source opinions (*see Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir.

2004)), the ALJ gave them "great weight," noting also that there were "no treating source opinions

which are in conflict with these findings."   [*Doc. 15-7* at 42].   In April 2011, following her

examination of Plaintiff, Dr. Falgout concluded:

> The claimant appeared to be cooperative with me during the exam.   With regard to
> the multiple allegations regarding cirrhosis, gastroparesis, ADHD, and the systemic
> sclerosis, minimal findings were appreciated on exam:  only slightly decreased
> internal rotation on her shoulder exam of 70 degrees instead of 80 degrees, her
> inability to walk on her heels and toes and squat, and some decreased sensation of
> the palms.   So, based on these minimal findings on exam, my impression is that
> this claimant likely needs minimal limitations with regard to squatting; otherwise,
> she would be able to do other things such as sitting and standing and bending.

*Doc. 15-25* at 56.   In May 2011, Dr. Kuo determined from Plaintiff's medical record history that

the "objective functional evidence (including recent detailed [Consultative Exam by Dr. Falgout])

supports physical limitations that are primarily attributable to obesity."   [*Doc. 15-26* at 10].

Dr. Kuo indicated that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds,

could sit, stand and/or walk (with normal breaks) . . . about 6 hours in an 8-hour workday" (*id*.

at 3), had minimal postural limitations (*id*. at 4), and no other limitations at all (*id*. at 5-8).[28]

---

[28] The limitations described by Dr. Kuo for Plaintiff are consistent with an RFC for "light work," which
means she is also considered to be capable of "sedentary work."   20 C.F.R. § 404.1567(b).

Plaintiff's assertion that the ALJ did not properly consider symptoms of fibromyalgia and obesity appears to be based primarily on the fact that she did not conclude that Plaintiff is disabled. This Court must reiterate that, where substantial evidence supports the ALJ's findings and the correct legal standards were applied, the [Administration]'s decision stands, and the plaintiff is entitled to no relief. *See Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 31 F.3d at 760.   Moreover, "[i]n reviewing the ALJ's decision, we neither reweigh the evidence nor substitute our judgment for that of the agency." *Newbold v. Colvin,* 718 F.3d 1257, 1262 (10th Cir.2013) (internal quotation marks omitted).   "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . It is more than a scintilla, but less than a preponderance." *Id.* (citing *Lax*, 489 F.3d at 1084) (internal quotation marks omitted).   Finally, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (citing *Zoltanski*., 372 F.3d at 1200).   Applying these standards to the present case, this Court can only conclude that the ALJ's RFC assessment is supported by substantial evidence and must, therefore, be affirmed.

———————————————

# VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision is supported by substantial evidence.

**IT IS THEREFORE ORDERED** that Plaintiff's ***Motion to Reverse and Remand for Rehearing, with Supporting Memorandum (Doc. 20)*** is **DENIED** and the Commissioner's decision is **AFFIRMED**.   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_Lourdes a. Martínez_

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**